IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

LANORA PIERCE,                          *

    Plaintiff,                      *

vs.                                     *
                               CASE NO. 3:09-CV-123 (CDL)
BOARD OF REGENTS OF THE                 *
UNIVERSITY SYSTEM OF GEORGIA,
                               *

    Defendant.                      *

_____  *

O R D E R

    Plaintiff Lanora Pierce ("Pierce") is a museum preparator at the Georgia Museum of Art ("GMOA"), which is the academic museum for the University of Georgia and Georgia's State Museum of Art.[1]  Pierce contends that GMOA discriminated against her because of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), when GMOA denied her a promotion to chief preparator and hired Todd Rivers, a male, instead.  Pierce also asserts that she was denied the promotion in retaliation for pursuing a prior employment discrimination lawsuit against GMOA, in violation of Title VII and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA").  Presently pending before the Court is GMOA's Motion

---

[1] GMOA is part of the University of Georgia, which is operated by the Board of Regents of the University System of Georgia.  For the sake of simplicity, the Court refers to GMOA as the Defendant in this case.

for Summary Judgment (ECF No. 27).   For the reasons set forth below, the motion is denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P.  56(a).   In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   A fact is *material* if it is relevant or necessary to the outcome of the suit.   *Id.* at 248.   A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.   *Id.*

## FACTUAL BACKGROUND

Viewed in the light most favorable to Pierce, the record reveals the following.   Unless otherwise noted, the facts are undisputed for purposes of GMOA's summary judgment motion.

**I.   Pierce's Work History at GMOA**

Pierce began working at GMOA as a part-time security guard in 1996.   Later that year, GMOA hired Pierce as a utility worker/assistant preparator.   Her job duties included installing works of art, building exhibition furniture and temporary walls,

building crates for travel and storage of art, and packing works of art for travel and storage.   Pierce developed a specialty in preparing works on paper, including archival mounting, matting, and framing.   Pierce also assisted curators with exhibition design.   In 2005, Pierce's position was reclassified from "Utility Worker II" to "Museum Preparator," and she received a pay increase from "$23,252 to $23,660 in order to meet the FLSA requirements for exempt positions."[2]   Pl.'s Dep. Ex. 1, Memo from A. Mondi to L. Pierce, Mar. 15, 2005, ECF No. 28.

## II.  Pierce's Prior Lawsuit

Pierce filed a lawsuit in this Court against GMOA alleging sex discrimination under Title VII and the EPA.   In that action, Pierce alleged that she was not selected for a museum preparator position because of her sex and that she was paid less than a male employee for equal work.   Compl. ¶¶ 21-31, 38, *Pierce v. Bd. of Regents*, 3:05-cv-90-CDL, ECF No. 1 (M.D. Ga.) [hereinafter *Pierce I* Compl.].   The parties reached a settlement of that action in April of 2006.

## III. The Chief Preparator Position

In early 2008, Dennis Harper, GMOA's curator of exhibitions, resigned.   In addition to his curator duties, Harper oversaw the preparator department.   GMOA's director, Dr.

---

[2]  Pierce notes that she received the promotion after she filed an internal grievance and then an EEOC charge claiming wage discrimination based on gender.   *E.g.*, Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts 2 ¶ 5, ECF No. 46-1.

William Eiland, decided that he wanted an art preparator rather than an exhibition designer to lead the preparator department, and GMOA posted that it had an opening for the position of chief preparator. Eiland Dep. 84:24-86:21, ECF No. 41. Eiland did not draft the chief preparator description, but he did specify that he wanted a preparator and not a designer. *Id.* at 84:10-25, 108:3-8.

A.   Job Description

The written job description for the museum preparator position read:

> [1]  Plans and carries out preparation, design, and installation of exhibitions from the museum's permanent collection and traveling exhibitions, or other display materials.

> [2]  Designs graphics, signs, and labels for exhibitions.

> [3]  Designs and constructs shipping crates, display cases, and object mounts as required.

> [4]  Fabricates frames, cuts mats and glazing for two-dimensional works of art.

> [5]  Packs, moves and assists with storing collections.

> [6]  Maintains shop and fabrication areas, power tools and other equipment; inventories and orders supplies.

> [7]  Collaborates with curatorial staff on design of exhibitions and development of long-range plans for exhibitions.

> [8]  Administers departmental budget and oversees operations of preparation department, including a

> small staff of full-time and several temporary
> workers and student assistants.

> [9] Performs miscellaneous job-related duties as
> directed. Other duties as assigned. This is a
> full-time position with benefits that reports to
> Director.

Pl.'s Dep. Ex. 7 at BOR-0881, Chief Museum Preparator Job

Posting. The minimum qualifications, experience, and education

were listed as:

> [1] Minimum of five years['] experience in
> preparation department in a museum or gallery
> with demonstrable experience in exhibition
> design;

> [2] training and expertise in archival/maintenance
> techniques and procedures, including matting of
> works on paper and handling of traditional
> paintings.

> [3] Must have experience in art handling,
> preparation, and exhibiting works in many media,
> including decorative arts.

> [4] Supervisory experience required with proven
> management skills and knowledge of safety
> regulations and guidelines and EEO regulations.

> [5] Bachelor's degree required, graduate degree
> desirable; or equivalent professional experience.
> Course work in the arts or a discipline involving
> aesthetics.

*Id.*; accord Eiland Dep. 87:2-88-2 (stating that these

qualifications were the "minimum" qualifications).

The job listing listed the following required skills:

> [1] Ability to supervise the work of others; to
> establish and maintain effective, tactful, and
> courteous working relationships with fellow
> employees, faculty members, department heads, and
> the general public.

[2]  Microsoft Word, Photoshop and the ability to learn sign-making and other graphics software.

[3]  General and finish carpentry, crating, fabrication, wall painting and exhibition preparation.

[4]  Archival matting and framing, or the ability to learn those skills.

[5]  Knowledge of art handling and museum packing practices.

[6]  Knowledge of art installation procedures and techniques.

[7]  Skills in two- and three- dimensional design.

[8]  Managerial skills, including ability to maintain a budget.

[9]  Requires sensitivity to detail.

[10] Must be able to work both independently and within a team that includes museum curators, registrars, designers, security personnel, student interns, and museum specialists.

* * *

[11] Work involves moderate lifting and handling of objects up to 50 lbs., with mechanical assistance on heavier objects.

[12] Work requires stair climbing and the use of ladders or scaffolding. Standing or walking may occur up to 40% of the time.

[13] Work environment may involve exposure to paints, adhesives, and other safety-labeled materials that require following extensive safety precautions.

[14] Work will require the use of portable and stationary power tools.

[15] Work will require occasional short- and long-distance travel. Ability to drive a mid-size box van.

Pl.'s Dep. Ex. 7 at BOR-0881 to BOR-0882, Chief Museum Preparator Job Posting.

The primary daily activities of the chief preparator were to be supervising two museum preparators and doing preparator work. Manoguerra Dep. 27:1-28:8, ECF No. 40 (stating that chief preparator would supervise other preparators and do preparator work at the same time). Eiland, who ultimately made the chief preparator hiring decision, "did not want a[n exhibition] designer" for the position; he wanted a person "with proven preparator skills who will get his or her hands dirty in the actual installation of . . . exhibitions." Eiland Dep. 84:24-85:6, 96:7-12. Another consideration in the hiring decision was GMOA's upcoming expansion because the chief preparator would have a role in moving the museum's collection. Manoguerra Dep. 69:8-11.

B.   Search Committee

In preparing to fill the chief preparator position, Eiland consulted with Len Davis, one of UGA's equal employment opportunity officers. Eiland Dep. 80:12-22, 82:5-7. Eiland testified that he "probably" consulted with Davis because of "the composition of it, and we had just finished with the earlier suit"—Pierce's prior action against GMOA. *Id.* at 81:16-82:1. Davis recommended that Eiland form a search committee and place GMOA's department heads on it. *Id.* at 81:9-13. Eiland

did so, and he believes that he told the committee he wanted to hire someone with strong technical preparator skills for the chief preparator job.  Eiland Dep. 96:1-6.

The search committee consisted of three women and two men. The women were Cece Hinton, Tricia Miller, and Marge Massey; the men were Paul Manoguerra and Giancarlo Fiorenza.  The search committee received forty-seven applications and decided to interview three applicants: Carrie Weis, Todd Rivers, and Pierce.[3]  Weis withdrew her application before her interview, and the committee proceeded with the interviews of Pierce and Rivers.

### C.   Qualifications of the Applicants

#### 1.   Background

It is undisputed that Pierce had worked for twelve years in the preparation department at GMOA when she applied for the chief preparator position.  Pierce has a Bachelor of Fine Arts in Painting and Drawing from UGA.  She also has a Master of Fine Arts in Painting and Drawing from UGA.

Rivers began working for Reynolda House Museum of American Art in Winston-Salem, North Carolina after he graduated from the Savannah College of Art and Design in 2001 with a Bachelor of Fine Arts in Illustration.  Rivers Dep. 9:18-23, 13:22-25, ECF

---

[3] Based on his application, Massey did not select Rivers as one of the top candidates to interview, though she does not recall why.  Massey Dep. 50:16-25, ECF No. 42.

No. 36.  He became a full-time employee as coordinator of museum services in January of 2002, and he was promoted to director of museum services in September of 2003.  *Id.* at 14:25-16:9.  The museum services department handled "all of the art handling and prep" and performed the functions of a preparatory department.  *Id.* at 20:19-21:3.  As director of museum services, half of Rivers's job responsibility was related to museum events, and the other half was setting up exhibitions.  *Id.* at 25:12-19.  It is undisputed that Reynolda House is an art museum in a historic house and that the museum completed a 30,000 square foot expansion during Rivers's tenure there, in either 2004 or 2005.  Rivers does not have a graduate degree.

> 2.  *Technical Qualifications*

> i.  EXHIBITION DESIGN

Pierce worked "in all aspects of the design of exhibitions, including production of renderings and 3-D models to assist visual interpretation and collaboration with preparators, curators, and registrars."   Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 7, Pl.'s Resume 1, ECF No. 47-6 [hereinafter Pl.'s Resume].  Pierce has designed at least ten exhibitions on her own.  Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 83, Pl.'s Decl. ¶ 14, ECF No. 49-6. Also, since 2006, Pierce has "been largely responsible for the MFA student exhibitions."  Pl.'s Decl. ¶ 22.  According to Manoguerra, Pierce was "very good at

those exhibitions." Manoguerra Dep. 107:11-14. In addition, Pierce has learned to use 3-D modeling software to produce floor plans for exhibitions. Pl.'s Decl. ¶¶ 12-13, 15.

At Reynolda House, Rivers was on the exhibitions committee, which "met to discuss the exhibitions that the museum would have in collaboration with the curator of American art and the director to decide the overall design of the exhibition, choosing paint colors, choosing labels, choosing placement of art within the exhibition." Rivers Dep. 22:9-22. GMOA did not point the Court to evidence that Rivers had experience independently designing exhibits.

ii. ART HANDLING, INSTALLATION, AND PACKING PRACTICES

Pierce "installed over 300 exhibitions" at GMOA. Pl.'s Resume 1. During fiscal year 2008 alone, GMOA had nineteen exhibitions, including six different installations of permanent collection objects. Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 86, GMOA Annual Report 57, ECF No. 51-1. Pierce also has experience packing and moving large amounts of art. Pierce "facilitated over 100 traveling exhibitions, including more than 4,000 works of art. This required crate fabrication, soft and hard packing, transport by car, van and box truck." Pl.'s Resume 1. When GMOA moved into a new facility across campus in 1996, Pierce assisted with the move, which involved "thousands"

of works of art.    Pl.'s Decl. ¶ 3.    And when GMOA's fire suppression sprinkler system had to be replaced in 2008, Pierce worked to move and protect the artwork, which included packing and returning "quite a few" loaned works of art to their owners. *Id.* ¶¶ 24-27.   This project also included packing a traveling exhibition that contained 106 framed works on paper.   *Id.* ¶ 28.

When Rivers began at Reynolda House, there was not "rotating exhibition space," so the changes to exhibits consisted of "changing out the artwork within the historic house;" after the expansion, Reynolda House had "three to seven exhibitions a year." Rivers Dep. 25:20-26:7.  At Reynolda House, Rivers "did not loan out too many works, so [he] did not actually do a ton of physical crating." *Id.* at 32:8-13.  Rivers did gain some experience couriering several pieces of art (one or two pieces at a time) between lending institutions within North Carolina and Reynolda House. *Id.* at 37:23-39:1.  After the Reynolda House expansion, Rivers had to pack and move some artwork, but "[p]acking and crating was not necessary because [the art] didn't ever go off site, it just went from one room to another;" to move art within Reynolda House, Rivers and his employees wrapped the artwork "in bubble" and transported it on an art cart.   *Id.* at 30:6-31:10.

### iii. ARCHIVAL TECHNIQUES

Pierce matted and framed "well over 2,000 works on paper for exhibitions."[4]   Pl.'s Resume 1.   Pierce also attended at least three seminars on "works on paper conservation," and she taught a workshop on archival matting, framing, and storage of works on paper.   Pl.'s Resume 2.

While at Reynolda House, Rivers had no training in archival matting and framing.   He "did not" do archival matting and framing at Reynolda House, though he did mat and frame "a couple of things at home."   Rivers Dep. 28:13-20.   At Reynolda House, Rivers's framing duties were "limited to assisting the collections manager and deciding which mats and which framing . . . to choose" because the museum "did not have the capacity for a wood shop or a frame shop" and it therefore had to outsource a lot of its framing duties.   *Id.* at 21:16-22:8.

### iv.  GENERAL AND FINISH CARPENTRY

Pierce has installed "over 300 exhibitions," which involved construction of exhibition furniture, including "object mounts, cases, pedestals, vitrines, [and] temporary walls and floors." Pl.'s Resume 1.   She built "small to large wall cases; many exhibition props, such as wood or plexi boxes/holders/fabric armatures; and on one occasion a life size camel and donkey for an exhibition; slant boards for quilts; an upright mat board

---

[4] GMOA contends that Pierce cannot verify this claim, but GMOA pointed to no evidence to refute it.

holder; and shelves/bins to hold works of art."  Pl.'s Decl.
¶ 7.

Reynolda House did not have a wood shop until after the
expansion.   After the expansion, Reynolda House had a small
workshop, and Rivers "fabricated small cases and pedestals."
Rivers Dep. 31:11-20.   During his interview, Rivers told the
committee that he had built a deck on his house as an example of
his carpentry skills.  Hinton Dep. 29:17-23, ECF No. 37.

v.   DESIGN AND CONSTRUCTION OF SHIPPING CRATES

As discussed above, Pierce "facilitated over 100 traveling
exhibitions, including more than 4,000 works of art.   This
required crate fabrication, soft and hard packing, transport by
car, van and box truck."  Pl.'s Resume 1.

Prior to coming to GMOA, Rivers did not have any experience
building crates for moving pieces of art, though he did know "a
theoretical practice of building crates."   Rivers Dep. 130:19-
131:4.

vi.  DESIGN AND CREATION OF EXHIBITION LABELS

Pierce worked with the previous curator to create
exhibition labels and "was the only remaining person [at GMOA]
with that skill" after he left.   Pierce Decl. ¶ 30.   Pierce
trained another preparator to produce exhibition labels.  *Id.*

Rivers's training in label making was "on the job." Rivers
Dep. 27:15-22. According to Pierce, Rivers did not know about

requirements that the exhibition labels comply with the Americans with Disabilities Act.  Pierce Decl. ¶ 54.

vii. SHOP MAINTENANCE

Pierce "worked extensively in the [GMOA] preparator shop and used all of the equipment, which includes power tools: table saw, panel saw, circular saws, router, drills, sanders, painting equipment and a wall-mounted cutter for cutting glass, Masonite, plexi glass, and cardboard, as well as obvious items, such as hammers, nails and hardware for building crates and hanging works of art. The shop contained various kinds of foam used in crating, etc. that were cut and hot glued, mount making hand tools and brass/metal supplies. There was also another room with two mat cutters and a small circle mat cutter."  Pl.'s Decl. ¶ 6.

Reynolda House did not have a wood shop until after the expansion.  After the expansion, Reynolda House had a "very small wood shop." Rivers Dep. 23:3-7.

3.   *Supervisory Qualifications*

At Reynolda House, Rivers, ran the museum services department, including "budgetary responsibilities, setting and maintaining the department of budget, supervising staff, doing performance evaluations, attending department head meetings in which the movement of art and events were discussed, and then charged with carrying out those directives."  Rivers Dep. 16:15-

14

23.   Rivers supervised one full-time employee and one part-time employee. *Id.* at 18:14-25. Rivers also "indirectly" supervised contract construction labor. *Id.* at 21:4-15. Rivers was responsible for a budget of approximately $130,000. *Id.* at 24:12-25:8.

After Harper resigned from his position as curator of exhibitions, Pierce assumed his job responsibilities over the preparator department, including supervising the other full-time preparator and several part-time workers; it was during this same timeframe that the sprinkler replacement project took place. Pl.'s Decl. ¶¶ 23-28. Pierce also supervised a number of student workers, interns, and part-time workers. *Id.* ¶¶ 16-17. Pierce received positive performance reviews for her supervision. *E.g.,* Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 95, L. Pierce 2002 Performance Review, ECF No. 52-8, at BOR-0218 ("Ms. Pierce continues to supervise the work-study employees with fairness and efficiency; her dealings with her own intern over the summer were successful and beneficial to the museum."); Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 97, L. Pierce 2004 Performance Review, ECF No. 52-10, at BOR-0190 ("Ms. Pierce has shown good supervisory practice, particularly in the areas of label production and mat room activity."). Pierce also assisted with budgeting for the preparator department, Pl.'s Decl. ¶¶ 31-

38, though there is evidence that budgeting was not one of Pierce's strengths, *e.g.,* Massey Dep. 68:8-18, ECF No. 42.

Eiland did testify that Pierce "didn't evidence any ability" to perform supervisory tasks while she was supervising the preparator department during the first half of 2008. Eiland Dep. 130:10-18. This conclusion was based in part on Eiland's perception that Pierce had developed a "pattern" of "continually hav[ing] difficulty with other employees." *Id.* at 130:19-25. According to Eiland, Pierce had difficulty with Greg Benson and Julie Feldman. *Id.* at 131:1-4. Pierce had complained about Benson and Feldman in her prior lawsuit. *E.g., Pierce I* Compl. ¶¶ 17-25 (alleging that Benson and Feldman were partly responsible for Pierce being paid less for equal work than a similarly situated male and that Benson and Feldman had discouraged Pierce from applying for a promotion).

D.   The Interviews

The search committee interviewed Pierce and Rivers in April of 2008.

1.   *Pierce's Interview*

The committee was underwhelmed by Pierce's interview. According to Manoguerra, the "general tone" of Pierce's interview was "negative and depressing" based on Pierce's demeanor. Manoguerra Dep. 86:13-25. Massey stated that Pierce was "less formal" than Rivers because she already knew the

committee members.   Massey Dep. 92:11-14.   Massey believed that
the lack of formality in Pierce's demeanor and content was "less
professional" than Rivers's interview.   *Id.* at 170:19-171:2.
Massey also stated that Pierce "sat in a chair at the end of a
table and kind of slouched, laughed about things that maybe out
of nervousness that weren't really jokes . . . it was just like
sitting down to have a chat with your friends instead of like a
formal interview, and it was our intention that it be a formal
interview."   *Id.* at 195:5-10.   Miller thought that Pierce
"occasionally seemed a bit defensive" but could not recall
specifics of the interview.   Miller Dep. 66:1-10, ECF No. 38.
Hinton, the most positive of the bunch, said that the interview
"went well" but that it was not "great."   Hinton Dep. 35:15-19.
Hinton thought that it was a difficult dynamic because Pierce
and the members of the search committee already knew each other.
*Id.* at 35:20-22.

Pierce denies that she "acted unprofessionally, slouched or
was negative," Pl.'s Decl. ¶ 4, but she believes that the
interview was "somewhat awkward," Pl.'s Dep. 105:19-21.   Pierce
did not believe that the committee viewed her as a "fresh
applicant."   Pl.'s Dep. 106:11-12.   According to Pierce,
Manoguerra said, "we already know what you do but go ahead and
tell us anyway."   *Id.* at 105:22-23.   At one point during the
interview, Massey answered a question for Pierce.   *Id.* at

105:14-106:19.   Massey admitted that she did not believe that Pierce should have been interviewed and that she viewed the interview offer as a courtesy.  Massey Dep. 61:1-12.

       2.  *Rivers's Interview*

The committee had a much more favorable impression of Rivers's interview.  Manoguerra had a "very positive" impression of Rivers because of his enthusiasm and the way Rivers interacted with the committee members.  Manoguerra Dep. 79:22-80:2.  Likewise, "everything" about Rivers's interview impressed Massey, Massey Dep. 91:2-9, though she did not recall many specifics of the interview.   Hinton thought that Rivers's interview was "excellent" because he "seemed very confident and skilled and talked about moving the contents of the museum where he was working to the new building."  Hinton Dep. 24:10-16. Hinton did note that Rivers stated that his carpentry experience included building a deck on his house, which Hinton thought didn't "relate well" to the GMOA job.  *Id.* at 29:17-25.  Miller thought that Rivers "gave a very good interview," and she remembered that Rivers was "personable" and appeared to be "honest and forthright."  Miller Dep. 46:1-11.  There is no evidence that Rivers lied about or exaggerated his qualifications during the interview.

E.   Hiring Decision

After the interviews, the committee discussed the candidates and unanimously decided to recommend Rivers for the chief preparator position.[5] Manoguerra Dep. 88:6-10; Master Exs. File Ex. 3, Memo from Chief Museum Preparator search committee to B. Eiland and A. Mondi, Apr. 17, 2008, ECF No. 43.  In the memo, the committee stated that Rivers met the requirement of five years' experience in a preparation department at a museum, that he had demonstrable experience in exhibition design, that he had a thorough knowledge of art handling, museum packing, and art installation, and that he had the ability to work well both independently and within a team.  The memo highlighted Rivers's good interview and his experience relocating the collection of Reynolda House into the new expansion.  The memo also described Rivers as a "working manager" who had already managed a museum's staff of preparators and contract laborers and noted that none of the other applicants had that level of supervisory experience within an art museum. Master Exs. File Ex. 3, Memo from Chief

---

[5] Hinton initially wanted to recommend Pierce because she "really liked the idea of hiring from within."  Hinton Dep. 52:6-15.  Hinton, however, ultimately deferred to the other members of the committee because they worked more directly with the preparators. Id. at 55:1-56:6.  Manoguerra felt that even if it would be preferable to hire someone from inside GMOA, that consideration "was greatly outweighed by the negative interview on the part of [Pierce] and the positive interview on the part of [Rivers], that he was significantly the better person, and that it was better not to hire from within, promote from within, because he was so much better [based on his interview performance and his application]."  Manoguerra Dep. 90:5-91:6.

Museum Preparator search committee to B. Eiland and A. Mondi, Apr. 17, 2008, ECF No. 43.

After considering the committee's input, reviewing Rivers's resume, and asking Rivers a few questions, Eiland made the decision to hire Rivers.[6]  Eiland Dep. 111:7-14, 119:4-120:1, 128:4-8.

F.  Pierce's Claims

Pierce's claims in this action are premised on GMOA's failure to promote her to the chief preparator position. Although Pierce points to evidence of other incidents that she contends establish discriminatory animus on the part of Eiland and GMOA, Pierce does not contend that those incidents are "separate and distinct claims."  Pl.'s Resp. to Def.'s Mot. for Summ. J. 18 n.27, ECF No. 46.

DISCUSSION

**IV.  Pierce's Discrimination Claim**

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Where, as here, there is no direct evidence of discrimination, the Court uses the burden shifting

---

[6] There is a dispute as to whether Eiland met with Rivers when Rivers came for his interview.  *Compare* Rivers Dep. 61:17-25 (stating that Rivers did not meet with Eiland) *with* Eiland Dep. 111:7-14 (stating that Eiland met with Rivers on the day of his interview).

approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1347 (11th Cir. 2007) (per curiam). Under the *McDonnell Douglas* framework, Pierce must establish a prima facie case of discrimination. *Id.* The burden then shifts to GMOA to articulate a legitimate nondiscriminatory reason for the challenged employment action. *Id.* Finally, the burden returns to Pierce to prove that the articulated reasons are pretext for discrimination. *Id.*

To establish a prima facie case of failure to promote, Pierce must demonstrate that "(i) she belonged to a protected class; (ii) she was qualified for and applied for a position; (iii) despite qualifications, she was rejected; and (iv) the position was filled with an individual outside the protected class." *Id.* at 1347 n.2. GMOA does not seriously dispute that Pierce has made out a prima facie case of discrimination. Pierce is a female, was qualified for and applied for the chief preparator position, was rejected, and the position was filled with a male. GMOA articulated legitimate nondiscriminatory reasons for selecting Rivers instead of Pierce: (1) Rivers had more supervisory experience, and (2) Rivers interviewed better than Pierce. The remaining question is whether Pierce has

pointed to sufficient evidence to create a genuine fact dispute on pretext.

In a failure to promote case, a "'plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [employee] who received the position [s]he coveted. A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [gender]." *Harrell v. Ala. Dep't of Educ.*, 342 F. App'x 434, 436 (11th Cir. 2009) (per curiam) (first and second alterations in original) (quoting *Alexander v. Fulton Cnty.*, 207 F.3d 1303, 1339 (11th Cir. 2000)). To rebut GMOA's proffered reason for selecting Rivers instead of her for the chief preparator position, Pierce "must show that the disparities between the successful applicant's and her own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff[.]'" *Id.* (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004), *overruled on other grounds in Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-57 (2006)).

The Court is satisfied that there is a genuine fact dispute as to whether the disparities between the technical qualifications of Pierce and Rivers were of such a weight and significance that no reasonable person could have chosen Rivers

over Pierce based on the technical qualifications.  Viewed in
the light most favorable to Pierce, the record shows that Pierce
had substantially more experience than Rivers in every technical
element of the chief preparator job description, and Rivers had
virtually no experience in some of the minimum technical
requirements of the job.

1.  <u>Preparator Experience.</u>  Pierce had twelve years of
    experience in a museum preparation department.  She also
    had an MFA.  At most, Rivers had six and a half years of
    experience, and only half of his responsibilities in the
    museum services department related to setting up
    exhibitions.  Rivers had a BFA but no graduate degree.

2.  <u>Exhibition Design.</u>  Pierce had significant experience
    designing exhibitions on her own.  Rivers did not.

3.  <u>Installation, Packing, and Moving Art.</u>  Pierce installed
    more than 300 exhibitions at GMOA and worked in an
    environment that involved significant movement of artwork
    within the museum and as traveling exhibitions.  She
    assisted with one significant cross-campus move that
    involved thousands of works of art, and she packed and
    either stored or returned to lenders many works of art as
    part of the sprinkler replacement project.  Rivers's
    experience was limited in comparison; even after the
    expansion, Reynolda House had three to seven exhibitions a
    year and did not loan out many works.  And when it was
    necessary to move art at Reynolda House, it was just from
    one room to another, so packing and crating was not
    necessary.

4.  <u>Archival Techniques.</u>  Pierce had significant experience
    matting and framing artwork, and she both attended and
    taught seminars on archival matting, framing, and storage.
    Rivers had no formal training in archival matting and
    framing and did not do any archival matting and framing at
    Reynolda House because those duties were outsourced, though
    he did mat and frame a couple of things at home.

5.  <u>General and Finish Carpentry.</u>  Pierce had extensive
    construction experience and had built everything from
    temporary walls and pedestals to display cases and

exhibition props.   In contrast, Rivers fabricated small cases and pedestals.   To illustrate his carpentry experience during his interview, Rivers mentioned that he had built a deck on his house.

6.   <u>Design and Construction of Shipping Crates.</u>   Pierce had significant experience fabricating crates and transporting art.   Rivers only had a theoretical knowledge of crate building.

7.   <u>Design and Creation of Exhibition Labels.</u> Pierce was one of two people who created exhibition labels at GMOA, and she trained another preparator to create labels. Rivers had on the job training for label design and creation but was unaware of ADA requirements for exhibition labels.

8.   <u>Shop Experience</u>.   Pierce worked extensively in GMOA's preparator shop and was experienced with all of the equipment.   Rivers did not have access to a wood shop at Reynolda House until after the expansion, and even then the shop was very small.

In summary, a jury could conclude, based on Rivers's own testimony, that Rivers's experience in a museum preparatory department consisted chiefly of hanging on a wall art that had already been prepared and framed.   Based on this evidence, a reasonable juror could conclude that there are significant disparities between the technical qualifications of Pierce and Rivers.   In addition, based on a comparison of the skills listed in the chief preparator job description and Rivers's actual skills, a reasonable juror could conclude that Rivers had no training or experience that would qualify him to perform several technical duties that were minimum requirements of the chief preparator job.   For example, a minimum qualification of the chief preparator job was "training and expertise in

24

archival/maintenance techniques and procedures, including matting of works on paper and handling of traditional paintings." Pl.'s Dep. Ex. 7 at BOR-0881, Chief Museum Preparator Job Posting. GMOA pointed to no evidence that Rivers met this minimum requirement. Rather, the evidence in the present record suggests that Rivers "did not" do archival matting and framing at Reynolda House and that his framing duties prior to GMOA were "limited to assisting the collections manager in deciding which mats and which framing . . . to choose." Rivers Dep. 21:16-22:8, 28:13-20. Hiring someone who does not possess the stated minimum qualifications for a position could authorize a jury to find that the employer's articulated reasons for its decision were pretextual. *See Bass v. Bd. of Cnty. Comm'rs*, 256 F.3d 1095, 1107-08 (11th Cir. 2001), *abrogated on other grounds as recognized in Crawford v. Carroll*, 529 F.3d 961, 971 (11th Cir. 2008) (finding that county's hiring of an employee who was unqualified for a position instead of the plaintiff, who was qualified, supported an inference of discrimination). The Court does not find today that Rivers failed to meet the minimum qualifications for the chief preparator job. Rather, the Court finds that that Pierce has pointed to evidence that, with all reasonable inferences construed in her favor, would allow a reasonable jury to make that conclusion.

GMOA contends that even if Pierce had superior technical expertise, GMOA selected Rivers over Pierce because he had stronger supervisory experience.   The evidence viewed in the light most favorable to Pierce, however, shows that the chief preparator position was a hands on position and that the chief preparator would be required to do preparator work alongside the two museum preparators while also supervising them.   As discussed above, a reasonable juror could conclude that Rivers had virtually no experience in several of the key technical elements of the chief preparator job, including archival techniques and crate construction, and he had only limited experience in others, such as carpentry and exhibition design. A reasonable juror could conclude, based on the evidence in the present record, that these skills were minimum requirements of the chief preparator job and that Rivers did not possess all of them.   A reasonable juror could also conclude that Rivers's lack of experience would render Rivers unprepared to supervise and work in these areas, regardless of his general supervisory experience.

GMOA also contends that the decision to hire Rivers was based on Rivers's superior interview.   As discussed above, there is a genuine fact dispute as to whether Rivers met the minimum qualifications in certain technical aspects of the chief preparator position, and GMOA pointed to no evidence that an

interview—even an outstanding one—could make up for a lack of technical qualifications for the chief preparator job. Based on the evidence before the Court, the chief preparator job had serious technical requirements, and under such circumstances a reasonable fact finder could conclude that it is implausible to suggest that an interview would trump an applicant's failure to meet the minimum stated requirements for the position.

For the reasons set forth above, the Court concludes that Pierce has pointed to sufficient evidence to create a genuine issue of material fact on the question whether GMOA's proffered reasons for hiring Rivers instead of Pierce are pretext for discrimination. Accordingly, GMOA's motion for summary judgment as to Pierce's discrimination claim is denied.

## V.   Pierce's Retaliation Claim

To establish a prima facie case of retaliation, Pierce must show that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse employment action, and (3) there was a causal link between the two. *Dixon v. The Hallmark Cos.*, 627 F.3d 849, 856 (11th Cir. 2010); *accord Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000) (outlining prima facie case of retaliation under the Fair Labor Standards Act, which was amended to include the EPA). GMOA does not dispute that Pierce engaged in statutorily protected activity when she filed the prior lawsuit in 2005. GMOA also does not

27

dispute that Pierce suffered a materially adverse employment action when she was not promoted in April 2008.  GMOA contends that there is no causal relation between the two events because of the two-year gap between the settlement of the prior lawsuit and the denied promotion.

GMOA correctly asserts that while causation can be established "by showing close temporal proximity between the statutorily protected activity and the adverse employment action," "mere temporal proximity, without more, must be very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (internal quotation marks omitted).  The Court agrees that if Pierce had only pointed to evidence of temporal proximity as evidence of causation, then GMOA would be entitled to summary judgment because the 2005 lawsuit/2006 settlement was not "very close" to the 2008 denied promotion.  *See id.* (finding that three-month delay was too long to meet "very close" requirement).  Here, however, Pierce pointed to evidence that Eiland specifically contemplated Pierce's prior lawsuit just before he made the hiring decision, and a reasonable juror could conclude that in Eiland's mind, GMOA had "just finished with" Pierce's prior action against GMOA.  Eiland Dep. 81:16-82:1.  In addition, Eiland noted that he thought that Pierce was not qualified for the chief preparator position because she had "difficulties" with the two employees whose conduct was an issue

in Pierce's prior lawsuit.  *Id.* at 130:19-131:4.  From this, a reasonable juror could conclude that Eiland declined to promote Pierce not because he thought she would make a bad supervisor but because he viewed her as a troublemaker who complained too much about the violation of her rights under the employment laws of the United States.  Accordingly, the Court finds that Pierce has established a prima facie case of retaliation.

GMOA's proffered legitimate non-retaliatory reason for its decision to hire Rivers is the same as its proffered legitimate nondiscriminatory reason.  As discussed above, Pierce pointed to sufficient evidence to create a genuine fact dispute on the question whether GMOA's proffered reasons for hiring Rivers instead of Pierce are pretextual.  For all of these reasons, GMOA's summary judgment motion as to Pierce's retaliation claim is denied.

CONCLUSION

For the reasons set forth above, GMOA's Motion for Summary Judgment (ECF No. 27) is denied.


IT IS SO ORDERED, this 25th day of August, 2011.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE